**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **BLUE COMPASS RV, LLC F/K/A RV RETAILER, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:24-cv-00715-ALM** |
| | § | |
| **ZURICH AMERICAN INSURANCE COMPANY,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

# BLUE COMPASS'S MOTION FOR NEW TRIAL OR TO ALTER OR AMEND THE JUDGMENT


Submitted by:

Travis M. Brown
Texas Bar No. 24061890
tbrown@cokinoslaw.com
E. Samuel Crecelius III
Texas Bar No. 24105757
screcelius@cokinoslaw.com
Timothy P. Delabar
Texas Bar No. 24116273
tdelabar@cokinoslaw.com
COKINOS | YOUNG
One Galleria Tower
13355 Noel Road, Suite 1375
Dallas, Texas 75240
Telephone: (817) 635-3600
Facsimile: (817) 635-3633

**ATTORNEYS FOR PLAINTIFF BLUE COMPASS RV, LLC F/K/A RV RETAILER, LLC**

Following a three-day bench trial, the Court issued Findings of Fact and Conclusions of Law [ECF 90] for its determination that (1) Blue Compass suffered a loss of $1,360,990.62 due to flooding at Lot 1368, (2) the Policy covered Blue Compass's loss, (3) the Policy did not exclude Blue Compass's loss, and (4) Zurich's attempts to retroactively rewrite the Policy through Endorsement 20 were ineffective. [ECF 90] at 10 ¶ 58, 12 ¶¶ 9-11. But the Court also determined the Policy should be reformed to match what it believed to be the parties' mutual intent. *Id.* at 13 ¶ 15. As a result, the Court entered Final Judgment that Blue Compass take nothing on its claims. [ECF 91]. In reaching this conclusion, the Court applied the wrong legal standard for reformation and relied on clearly erroneous factual findings. Blue Compass moves under Federal Rule of Civil Procedure 59(a)(1)(B), (a)(2), and (e) for a new trial or for the Court to alter its Final Judgment and enter judgment in favor of Blue Compass on all claims.

## STANDARD OF REVIEW

Upon a Rule 59(a) motion for new trial in a nonjury case, federal courts are permitted to either "grant a new trial on all or some of the issues" or "open the judgment . . . , take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(1)(B), (a)(2). Such a motion for new trial "should be based upon a manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." *Swanston v. City of Plano*, No. 4:19-cv-412, 2025 WL 552813, at *3 (E.D. Tex. Feb. 19, 2025). "[T]he analysis often resembles an analysis to alter or amend a judgment in that courts frequently look to see whether there has been a manifest error of law or mistake of fact that justifies setting aside the results of the earlier trial." *Id.* (quotation modified).

A Rule 59(e) motion to alter or amend the judgment similarly calls into question the judgment's correctness. *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004). The Court

has considerable discretion in deciding whether reconsideration is warranted based on the competing interests of bringing litigation to an end and ensuring a just decision. *Id.* at 479. When a judgment is based on a manifest error of law or fact, reconsideration under Rule 59(e) is appropriate. *Dey v. State Farm Mut. Auto. Ins.*, 789 F.3d 629, 635 (5th Cir. 2015).

A manifest error of law is one that is plain, indisputable, and amounts to a complete disregard of the controlling law. *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Applying the wrong legal standard is a manifest error of law. *Id.* (citing *LaCombe v. A–T–O, Inc.*, 679 F.2d 431, 435 (5th Cir.1982)); *Grand Famous Shipping Ltd. v. Port of Houston Auth.*, 572 F. Supp. 3d 307, 316 (S.D. Tex. 2021) ("A manifest error . . . is the wholesale disregard, misapplication, or failure to recognize controlling precedent." (internal quotations omitted)).

A manifest error of fact is an obvious mistake or departure from the truth. *Hernandez v. Results Staffing, Inc.*, No. 4:14-CV-182-A, 2019 WL 1275448, at *1 (N.D. Tex. Mar. 20, 2019) (citing *Bank One, Tex., N.A. v. F.D.I.C.*, 16 F. Supp. 2d 698, 713 (N.D. Tex. 1998)). This is similar to the clearly erroneous standard by which the Fifth Circuit reviews findings of fact. *Interstate Fire & Cas. Co. v. Cath. Diocese of El Paso*, 622 F. App'x 418, 420 (5th Cir. 2015). Under that standard, a finding of fact is clearly erroneous if it is without substantial evidence to support it, the Court misinterpreted the effect of the evidence, or the reviewing court is convinced that the finding is against the preponderance of credible testimony. *Petrohawk Props., L.P. v. Chesapeake Louisiana, L.P.*, 689 F.3d 380, 388 (5th Cir. 2012).

## ARGUMENT

The Court's Judgment is based on manifest errors of law and fact. First, even accepting the Court's findings of fact at face value, Zurich is not entitled to reformation because the Court misapplied the legal standard for reformation. Second, even if the Court's determination that

Zurich is entitled to reformation were not based on the wrong legal standard, the Court relied on a clearly erroneous factual finding that Zurich was prevented from listing Lot 1368 on the flood exclusion. Third, the Court erred in concluding Blue Compass's bad-faith claims cannot survive if the Policy is reformed.

## I. The Court committed a manifest error of law in concluding that Zurich is entitled to reformation in the absence of an original agreement containing all material terms.

Under Texas law, reformation requires two elements: (1) an original agreement and (2) a mutual mistake, made *after* the original agreement, in reducing the original agreement to writing. *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987). Zurich, as the party seeking reformation, must prove both elements by clear and convincing evidence. *GeoSouthern Energy Corp. v. Chesapeake Operating Inc.*, 274 F.3d 1017, 1021 (5th Cir. 2001). The Court recites this standard, but the Findings of Fact and Conclusions of Law reveal that it was misapplied because there was neither an original agreement to which the Court may reform the Policy nor a mutual mistake made after that original agreement in reducing the original agreement to writing.

### A. There is no original agreement to which the Court can reform the Policy.

The Court seemingly reforms the Policy to, at least with respect to Lot 1368, match the November Spreadsheets. *See* [ECF 90] at 14 ¶¶ 17-18; *see also*, *id.* at 15 ¶ 21 (explaining that the Court does not consider the formal coverage proposals because it finds them to represent a perpetuation of the initial mistake). But reformation "is based upon the premise that a contract was actually made, but the written memorandum thereof, because of a mutual mistake, does not truly reflect the actual agreement of the parties." *Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d 376, 382 (Tex. 1965). As the Texas Supreme Court explained, "an actual agreement reached prior to the drafting of the instrument involved is a requisite to an action for reformation." *Cherokee*

*Water*, 741 S.W.2d at 379. In other words, there must exist a prior agreement that satisfies the requirements to be a contract. That is simply not present here, and the Court did not find an actual agreement prior to the drafting of the Policy that varies from the terms of the Policy.

To start, the November Spreadsheets cannot be the original agreement. To be the original agreement to which the Court reforms the Policy, the November Spreadsheets would have had to "address all of [the] essential and material terms with a reasonable degree of certainty and definiteness," "be sufficiently definite to confirm that both parties actually intended to be contractually bound," and "be sufficiently definite to enable a court to understand the parties' obligations and to give an appropriate remedy if they are breached." *Cadence Bank, N.A. v. Elizondo*, 642 S.W.3d 530, 534 (Tex. 2022) (internal quotations omitted). The November Spreadsheets do not satisfy these requirements. Nor is there evidence of any other writings or even an oral agreement that satisfies these requirements.

The essential terms for an insurance contract, generally, are "the insurer, the subject matter to be insured, or the person insured and the beneficiary, the risk insured against, the commencement and period of risk undertaken by the insurer, the amount of insurance, [and] a premium and the time at which it is to be paid." 45 Tex. Jur. 3d Insurance Contracts and Coverage § 19 (Mar. 2026 update); *see also Hines v. Liberty Life Ins.*, No. EP-11-CV-545-KC, 2013 WL 310320, at *16 (W.D. Tex. Jan. 25, 2013) (identifying the material terms for an insurance contract). The November Spreadsheets do not contain all of these essential terms. They do not even contain the majority of these essential terms.

The November Spreadsheets identify the insurer. They arguably contain the subject matter to be insured. But after that is where they stop. The November Spreadsheets do not contain the

risks insured against; they are silent as to whether they form an all-risk or named perils policy. And, assuming the November Spreadsheets create an all-risk policy, they are silent as to any exclusions beyond flood and wind/hail. If Blue Compass's inventory is swallowed by earthquake, stolen by thieves, vandalized, or destroyed in a terrorist attack, would that loss be covered? Neither Zurich nor Blue Compass can determine their rights and obligations by reference to the November Spreadsheets. Even assuming they could, what is the limit of insurance? For that matter, what premiums is Blue Compass obligated to pay for this coverage? And what are the dates this coverage is active? The November Spreadsheets have no answers. The November Spreadsheets do not contain all essential and material terms, so they cannot be the prior definite and explicit agreement to which the Court reforms the Policy.

Separate from this fundamental requirement, neither party understood the November Spreadsheets to be an agreement between the parties. *See* 2.TR.203:16-19 (Zurich employee testifying that the November Spreadsheets had not gone through underwriting); 3.TR.20:10-21:11 (Zurich employee testifying that Zurich would not pay a claim if the location were initially listed as "covered for flood" in the November Spreadsheet but listed on the Policy's flood exclusion"); 1.TR.165:8-23 (MMA employee testifying she never sent spreadsheet to Blue Compass to review because it was not a proposal). Instead, the parties treated the November Spreadsheets as "an offer to begin discussions," which is neither an offer nor an agreement. *Matter of Texxon Petrochemicals, L.L.C.*, 67 F.4th 259, 263 (5th Cir. 2023). Nor did the Court find that the November Spreadsheets were an agreement. To the contrary, the Court expressly found that "[o]n December 6, 2022, at 1:05 PM, Plaintiff agreed to place insurance for its RV inventory with Defendant," and that Blue Compass was relying on the November 29 Coverage Proposal when it made that decision.

[ECF 90] at 7 ¶ 37. And the Court's findings of fact go further, noting that not only was this proposal the first time there were sufficient terms to make an enforceable agreement, it was also the first time Blue Compass had even reviewed the proposed coverages. [ECF 90] at 6 ¶ 32. Accepting the Court's factual findings as true, there was only a series of negotiations that culminated in the November 29 Coverage Proposal, which was the first actual agreement the parties could reach. There was no actual agreement before that date.[1]

The Court found that the parties' mutual intent was for Lot 1368 to be excluded for flood coverage, [ECF 90] at 17 ¶ 28, but reformation requires more than an intent, it requires "a definite and explicit agreement, understood in the same sense by both." *Champlin Oil*, 403 S.W.2d at 382. This principle is best exemplified in *Champlin Oil*. In *Champlin Oil*, the contract used what the Court called the "contract formula" as opposed to the "plant formula." 403 S.W.2d at 381-83.

[1] Highlighting that the November Spreadsheets are not an actual agreement between the parties about coverage is the fact that the November Spreadsheets do not match the Policy as issued in many other respects that are not reformed by the Court's Final Judgment. Attached as Exhibit 1 is a chart of the locations from D-103 with their corresponding location number on the Policy, if any—six locations do not appear on the Policy—and whether they are covered or excluded for both flood and wind/hail on the D-103 and the Policy. Those locations where either the flood or wind/hail coverage differed from D-103 to the Policy are in red. D-103 lists 126 discrete locations, 37 of which have different flood or wind/hail coverages in the Policy than what Zurich proposed in D-103. For 20 of those locations, Zurich proposed covering them for flood but then either listed the location on the flood exclusion or simply did not list that location on the Policy at all. Would Blue Compass be entitled to coverage if it suffered a flood loss at one of those locations on the grounds that the November Spreadsheets are the parties' agreement as to what coverage would be provided for each location? Zurich's Assistant Vice-President Claim Manager testified it would not because "it's the policy that controls." 3.TR.20:10-21:11. Alternatively, what if Blue Compass suffered a loss at one of the 50+ locations that do not appear on the November Spreadsheets but do appear on the Policy, would Zurich be able to deny the claim on the grounds that November Spreadsheet did not provide coverage for that location? The wind/hail coverages pose the same problems. Many of the locations list "$10k/$100k" under "Proposed Wind/Hail" on the November Spreadsheet, but the Policy has a uniform $5,000 per auto deductible and no per loss deductible for wind or hail damage. *Compare* Ex. D-103 at 2-4, *with* Ex. P-1 at 136. If a hail storm damages 50 vehicles at one of these locations, would Blue Compass's deductible be $250,000 because the Policy says the per loss deductible is not applicable or would it be $100,000 because the November Spreadsheets provide a per loss deductible of $100,000? If the loss was instead to 10 vehicles, would Blue Compass's deductible be $50,000 because the Policy says the deductible is $5,000 per auto or would it be $100,000 because the November Spreadsheets say $10,000 per auto? The rabbit hole that opens up when isolating individual components of a fluid negotiation process is nearly limitless, which is why reformation "hinges on an 'original agreement.'" *In re GGI Holdings, LLC*, 665 B.R. 727, 769 (Bankr. N.D. Tex. 2024) (quoting *Cherokee Water*, 741 S.W.2d at 379).

Champlin, the party seeking to reform the contract, requested two questions be submitted to the jury: (1) whether the parties intended that the plant formula apply and (2) whether the parties, as a result of a mutual mistake, believed that the contract language correctly described the plant formula. *Id.* at 381-82. This, the Court said, was a defective submission because "it failed to submit the basic issue of whether or not Champlin and Chastain agreed that the 'plant formula' should measure the liquid hydrocarbons contained in Chastain's gas." *Id.* at 383. More than the parties' intent is required, a "definite agreement, a meeting of the minds, is basic to the remedy of reformation." *Id*. Because the defendant asked only about intent, not whether an actual agreement was reached, the trial court properly refused the requested instruction. This important limitation on a reformation claim "arises from the inherent limitation on a court's authority to craft a contract that the parties did not mutually establish." *GGI Holdings*, 665 B.R. at 769; *see also Cherokee Water*, 741 S.W.2d at 379 ("A court is without power to make a contract that the parties did not make; an actual agreement reached prior to the drafting of the instrument involved is a requisite to an action for reformation.").

Further, the Court must begin with the presumption that the Policy correctly embodies the parties' intentions and is an accurate expression of the agreement the parties reached. *Estes v. Republic Nat'l Bank*, 462 S.W.2d 273, 275 (Tex. 1970). That presumption is only overcome if the Court finds by clear and convincing evidence not a general intent but that the parties reached a prior agreement that was definite and explicit, containing all essential terms so that it could be enforceable. *Id*; *see also Cont'l Cas. Co. v. Bock*, 340 S.W.2d 527, 533 (Tex. App.—Houston 1960, writ ref'd n.r.e.) (trial court erred in reforming insurance policy because "negotiations and conversations" prior to policy's actual delivery "fell short of any definite oral agreement as to

insurance coverage"). That simply did not happen on these facts *as the Court found them*. The first actual agreement—again, according to the Court's findings—was on December 6, 2022, when Blue Compass agreed to place insurance for its RV inventory based on the terms of the November 29 Coverage Proposal. [ECF 90] at 7 ¶ 37; *but see Champlin Oil*, 403 S.W.2d at 382 ("It is undisputed that the method of liquid hydrocarbon allocation was not discussed between Johnson and Chastain. Every species of belief and assumption will not afford a basis for relief by way of reformation."); *see also Gilbane Bldg. Co. v. Keystone Structural Concrete, Ltd.*, 263 S.W.3d 291, 301-02 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (where parties never discussed provision, court could not reform contract to match one party's "general practice" even when the other party understood "that would ordinarily be what was required"); *GeoSouthern Energy Corp.*, 274 F.3d at 1021 (reformation was not warranted, where no evidence showed that the parties agreed, before the contract's execution, that a response would be required within fifteen days, even though they had operated with that understanding).

Although certainly unintentional, the Court's decision to reform the Policy in the absence of an actual agreement amounts to a complete disregard of controlling law: the Texas Supreme Court's requirement that there be an actual agreement complete in all essential terms to which the Policy could be reformed. It would be a misapplication of the legal standard for reformation, and therefore a manifest error of law, for the Court to reform the Policy to anything besides what is contained in the first actual agreement between the parties—which, according to the Court's findings, occurred on December 6, 2022.

**B. There was no mutual mistake in reducing an original agreement to writing.**

Even if the November Spreadsheets were sufficiently definite that they could form the basis for a prior definite and explicit agreement, there is still no mutual mistake that could support

reformation. The objective of reformation is "to correct a mutual mistake made in *preparing* a written instrument so that the instrument truly reflects the *original* agreement of the parties." *Cherokee Water*, 741 S.W.2d at 379 (emphasis in original). Here, the Court found two mistakes, neither of which can support a reformation claim.

First, the Court found that Blue Compass made a mistake in not reporting inventory at Lot 1368. [ECF 90] at 13 ¶ 15, 14 ¶ 18, 15 ¶ 21, 17 ¶ 28. But that mistake occurred *before* the November Spreadsheets were exchanged between the parties and so cannot be the mistake that supports reformation because it was not "made after the original agreement, in reducing the original agreement to writing." *Cherokee Water*, 741 S.W.2d at 379.

Second, the Court found that Zurich perpetuated this mistake because its system would not allow it to report inventory at a location where there was no inventory. [ECF 90] at 13 ¶ 15. But that too is not a mistake that could support reformation. Accepting the Court's finding that Zurich was unable to list Lot 1368 on the flood exclusion because its computer system would not allow Zurich to do so,[2] then Zurich did not mistakenly fail to include Lot 1368 on the flood exclusion. Zurich, believing that there was no inventory at Lot 1368, chose not to list Lot 1368 on the flood exclusion. That is a mistake about the bargain itself, not a mistake in reducing the bargain to writing. *See Rocanville Corp. v. Nat. Gas Pipeline Co. of Am.*, 823 F.2d 92, 94 (5th Cir. 1987) (mistake must concern the terms of the contract itself, not some other feature of the transaction); *Nat'l Resort Cmtys., Inc. v. Cain*, 526 S.W.2d 510, 513 (Tex. 1975) ("it is not enough to show that both parties were mistaken about some feature of their bargain"). Stated differently, Zurich's mistake

[2] As detailed below, Blue Compass contends this finding was clearly erroneous, and the Court's judgment should be modified on that basis. But even if this finding were correct, the Court still committed a manifest error of law by concluding that Zurich's system's limitation is the type of mistake that supports reformation. Thus, for purposes of this argument, Blue Compass assumes that finding is correct.

was not that it believed Lot 1368 was listed on the flood exclusion. Rather, Zurich thought it unnecessary to list Lot 1368 on the flood exclusion because of its belief that there was no inventory at Lot 1368. Just as how a deed that is drafted before the agreement is reached cannot be reformed to match the subsequent agreement, even if signed version of the deed does not match the parties oral agreement, *Cherokee Water*, 741 S.W.2d at 379, so too an insurance policy that does not match the parties' agreement because of the known limitations of a computer program coded before that agreement cannot be reformed to match the subsequent agreement.

Even if these were the types of mistakes that reformation could correct, reformation requires that the same mistake be common to both parties. *E.g.*, *St. Paul Fire & Marine Ins. v. Culwell*, 62 S.W.2d 100, 101 (Tex. Comm'n App. 1933, judgm't adopted) (each party must "labor[] under the same misconception"). But the Court found that each party made a separate mistake. And there is no evidence that either party had knowledge of the other's purported mistake. Because the Court found that these two mistakes combined to form a mutual mistake, the Court determined that Zurich was entitled to reform the Policy. But, in doing so, it misapplied the standard for reformation. Reformation requires more than just a mistake. It requires the parties to have entered into an agreement "and subsequently made a mistake in reducing this prior agreement to writing." *Cherokee Water*, 741 S.W.2d at 380. The Court's findings of fact do not support that there was a mutual mistake that could form the basis for a reformation claim.

## II. The Court committed a manifest error of fact in finding that Zurich was prevented from listing Lot 1368 on the flood exclusion.

Although Blue Compass does not seek to relitigate every aspect of this case or challenge every factual finding it believes is contrary to the evidence presented, there is one factual finding that is both overwhelmingly contrary to the evidence and so significant to the Court's ultimate

conclusions that Blue Compass addresses it here. That is the Court's finding that Zurich's system would now allow a property to be listed on an exclusion if no inventory was reported at that property. [ECF 90] at 6 ¶ 30.

The Court's findings of fact are clearly erroneous if they are against the preponderance of credible testimony. That is precisely the case here. Miller testified, without explanation, that Zurich's system does not allow a property to be listed amongst the excluded locations unless inventory is reported there. *Id.* But there are numerous instances where Zurich did precisely what it claims it was unable to do: listed locations on the exclusions even though Blue Compass never reported inventory at those locations. Thus, the Court's finding regarding Zurich's system's capabilities is "implausible in light of the record considered as a whole," and therefore clearly erroneous. *Ladd v. Stephens*, 748 F.3d 637, 645 (5th Cir. 2014).

On the November Spreadsheets, there are 24 locations where no inventory is reported.[3] Of those, only three were identified as locations where inventory needed to be added in the November 9 email (Ex. D-130).[4] Of the remaining 21 locations where no inventory was ever reported before the Policy was issued, six are listed on either the flood or wind/hail exclusions on the Policy.[5] In other words, for almost one third of the locations where no inventory was ever reported before the

[3] Those are locations 10, 22, 62, 93, 94, 95, 96, 97, 98, 99, 100, 102 , 120, 122, 133, 135, 140, 142, 144, 153, 156, 158, 159, and 171. Location 107 (691 Treeland Dr) appears twice on D-103, once without inventory (row 92) and once with inventory (row 94), and so is not included in this count. Attached as Exhibit 2 is a chart showing those locations where no inventory was reported on D-103 along with their corresponding location number on the Policy and whether they are covered or excluded for both flood and wind/hail on the November Spreadsheets and the Policy. Those where either the flood or wind/hail coverage differed from the November Spreadsheets to the Policy are in red.

[4] Those are locations 22, 98, and 99. Only location 22 was excluded on the proposals and the Policy. Even though this email stated that inventory would be added to locations 98 and 99, neither location is listed on the flood exclusion on the proposals or the Policy itself.

[5] Those are locations 62, 93, 94, 96, 120, and 171. Interestingly, according to FEMA's Flood Map Service Center (https://msc.fema.gov/portal/search), every location that is in Flood Zone AE, with the exception of Lot 1368, made it onto the flood exclusion even if there was no inventory reported at that location. Given Zurich's testimony that it does not insure properties in Flood Zone AE, [ECF 90] at 14 ¶ 19, it would seem that Lot 1368's exclusion was not a computer limitation, but was, at best, an oversight.

Policy was bound, Zurich's system allowed it to list these locations on the exclusions on the Proposal, despite Zurich claiming that the computer system simply did not allow that to happen. Zurich offers no explanation for how it harmonizes its justifications about the limitations of its computer system and the documentary evidence that contradicts those justifications. Nor has Zurich provided any explanation for why it cross-referenced Lot 1368 with FEMA flood zones if it knew that it not only would not list Lot 1368 on the flood exclusion, [ECF 90] at 5 ¶ 23, but would be actively prevented from doing so by its computer program.

Adding to the mystery, there are some locations where no inventory is reported that say "covered" for flood on the November Spreadsheets but are later listed on the flood exclusion when the Policy was issued.[6] One example is location 171, row 88 on Exhibit D-103, which not only says "covered" under proposed flood, but also "$5,000" under proposed wind/hail, yet is listed on both the flood exclusion and the wind/hail exclusion on the Policy. *Compare* Ex. D-103 at 3, *with* Ex. P-1 at 149 (flood exclusion) & 126 (wind exclusion). Zurich has not provided any explanation for why locations that were listed as "covered" for flood on the November Spreadsheets, despite having no inventory reported, ended up being listed on the flood exclusion on the Policy in spite of Zurich's computer's systems supposed limitations. And, if the November Spreadsheets are the actual agreement between the parties, then surely Zurich would have asked the Court to reform the Policy to remove these locations from the flood exclusion so as to match the coverages in the November Spreadsheets. But it did not.

Finally, Zurich has not provided any explanation for why it would design a system with this strange limitation but not include anything in the Policy that conditions coverage on inventory

---

[6] These are locations 22, 96, 120, and 171, which all say "Covered" under the "Proposed Flood" column on Exhibit D-103 yet are listed as excluded for flood on the Policy.

being reported at a location. If, for example, Blue Compass had accurately reported $0 in inventory at Lot 1368 but moved inventory there in May 2023, that inventory would be covered under the Policy's clear language and there would be no exclusion that applies. Nor would there be any mistake. There would simply be policy language that does not say what Zurich wishes it said. Texas law presumes that Zurich read the Policy and accepted its terms. *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015). Zurich is a sophisticated insurance company, and, as such, it is not this Court's role to protect Zurich "from the consequences of [its] own oversights and failures in nonobservance of obligations assumed." *James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 403-04 (Tex. 2022). Yet Zurich now claims it designed a system that would prevent it from being able to exclude high-risk properties simply because no inventory was reported at that property and also did not include any conditions in the policy language that would have protected Zurich from the effects of that flaw in its system.

This factual error undermines the Court's judgment. The Court found that, because Zurich could not list Lot 1368 on the flood exclusion without inventory being reported there, the parties made a mutual mistake in recording their agreement. [ECF 90] at 15 ¶ 21. But if Zurich was able to list Lot 1368 on the flood exclusion and simply did not, then that undermines the Court's determination that there was a mutual mistake understood in the same sense by both parties. *See Rocanville Corp. v. Nat. Gas Pipeline Co. of Am.*, 823 F.2d 92, 94 (5th Cir. 1987) (mistake must concern the terms of the contract itself, not some other feature of the transaction); *GGI Holdings*, 665 B.R. at 769 (demonstrating that one party assumed or believed the contract contained certain terms or that both parties were mistaken about some feature of their bargain is insufficient). Thus,

separate and apart from the lack of an original agreement, the Court should modify its judgment because its factual findings rest on a mistaken view of the evidence.

## III. The Court applied the wrong legal standard in rendering a take-nothing judgment on Blue Compass's bad-faith claims.

Regardless of whether the Court modifies its judgment as to reformation, the Court should modify its judgment as to Blue Compass's bad-faith claims under both Texas common law and Chapter 541 of the Texas Insurance Code. The Court's judgment that Blue Compass take nothing on these claims is premised on the Court's belief that these claims cannot survive if the reformation claim is resolved in Zurich's favor. [ECF 90] at 18 ¶ 35 (citing *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 499 (Tex. 2018)). In reaching this conclusion, the Court misreads *Menchaca*.

*Menchaca* sets forth "the general rule" that "there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." 545 S.W.3d at 499. But here, Zurich denied a claim that was, in fact, covered. The Court has already concluded that Endorsement 20 was ineffective when issued based solely on the clear language of the endorsement. [ECF 90] at 12 ¶ 10 ("[T]he plain language of Endorsement No. 20 renders it ineffective."). The Court has also found that Zurich based its denial on Endorsement 20, even though Endorsement 20 was not a part of the Policy. *Id.* ¶ 63. In other words, at the time Zurich denied the claim and made its misrepresentations about the Policy, Blue Compass's claim was covered. For months, Zurich actively misrepresented the Policy language. It was only after the Court granted reformation that the claim became retroactively not covered, but that does not alter that Zurich misrepresented the Policy language when it told Blue Compass that Endorsement 20 excluded Blue Compass's claim. *Menchaca*'s "general" rule does not apply to that sort of subterfuge.

All of *Menchaca*'s "general" rules apply in the context of unchanged policy language. Those rules do not absolve an insurer of its active misrepresentations in the reformation context. Nor should they. And no case law supports such a position. Chapter 541 of the Insurance Code must "be liberally construed and applied to promote the underlying purposes"—namely, prohibiting unfair or deceptive acts or practices. TEX. INS. CODE §§ 541.001, 541.008. It is contrary to that legislative mandate to encourage an insurer who thinks it could prevail on a reformation claim from misrepresenting the policy language in an effort to discourage its insured from even challenging the reformation claim. But that is precisely what the Court's judgment encourages. Zurich actively misled Blue Compass in hopes that it would never have to defend its reformation decision in court. When Blue Compass called Zurich out, only then did Zurich seek judicial reformation of the Policy and argue that, because it should prevail on reformation, the Court should excuse its proven misrepresentations of the policy language to its insured. *Menchaca* does not and cannot stand for the proposition that an insurer can actively mislead its insureds in an attempt to avoid having a neutral factfinder determine if reformation is warranted and then claim no-harm, no-foul because the issue was eventually submitted to a court.

By reading *Menchaca* as prohibiting Blue Compass's bad-faith claims because Zurich prevailed on its reformation claim, the Court applied the wrong legal standard.

## CONCLUSION

The Court's reformation judgment is based on the wrong legal standard—determining that reformation is warranted in the absence of a prior agreement—and clearly erroneous factual findings—Zurich being unable to list a property on the exclusion if no inventory was reported, despite doing so for almost 30% of the properties for which no inventory was reported. Either reason is sufficient for the Court to grant Blue Compass relief under Rule 59.

Respectfully submitted,

COKINOS | YOUNG

*/s/ Travis M. Brown*
Travis M. Brown
Texas Bar No. 24061890
tbrown@cokinoslaw.com
E. Samuel Crecelius III
Texas Bar No. 24105757
screcelius@cokinoslaw.com
Timothy P. Delabar
Texas Bar No. 24116273
tdelabar@cokinoslaw.com
One Galleria Tower
13355 Noel Road, Suite 1375
Dallas, Texas 75240
Telephone: (817) 635-3600
Facsimile: (817) 635-3633

**ATTORNEYS FOR PLAINTIFF BLUE COMPASS RV, LLC F/K/A RV RETAILER, LLC**